# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VETON VEJSELI, BRETT PERRY, and CHRISTOPHER VILLINGER, on behalf of themselves and all similarly situated stockholders of Ionic Digital, Inc., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2025-0232-BWD |
| SCOTT DUFFY, THOMAS DIFIORE, SCOTT FLANDERS, ELIZABETH LAPUMA, and IONIC DIGITAL, INC., | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION DENYING MOTION TO DISMISS
## UNDER COURT OF CHANCERY RULE 23.1

Date Submitted: April 23, 2025
Date Decided: April 24, 2025

A. Thompson Bayliss, Daniel J. McBride, Nicholas F. Mastria, ABRAMS & BAYLISS LLP, Wilmington, DE; OF COUNSEL: Adrienne M. Ward, Lori Marks-Esterman, Jacqueline Y. Ma, Daniel M. Stone, OLSHAN FROME WOLOSKY LLP, New York, NY; *Attorneys for Plaintiffs Veton Vejseli, Brett Perry, and Christopher Villinger.*

Martin S. Lessner, Alberto E. Chávez, Andrew J. Czerkawski, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; *Attorneys for Defendants Scott Duffy, Thomas DiFiore, Scott Flanders, and Ionic Digital, Inc.*

Bradford J. Sandler, PACHULSKI STANG ZIEHL & JONES LLP, Wilmington, DE; *Attorneys for Defendant Elizabeth LaPuma.*

**DAVID, V.C.**

The plaintiffs in this expedited action are stockholders of Ionic Digital, Inc. ("Ionic"), a cryptocurrency mining company that was formed in January 2024 as part of Celsius Network, LLC's Chapter 11 bankruptcy proceeding. In connection with Ionic's upcoming annual meeting, the plaintiffs submitted notices nominating two candidates to serve as "Class I" directors on the company's classified board of directors (the "Board"). But days later, the plaintiffs learned that the Board had resolved to amend Ionic's bylaws to reduce the size of the Board, such that only one seat will be up for election at the annual meeting. In this action, the plaintiffs allege (among other claims) that the resolution reducing the size of the Board is the product of a breach of fiduciary duty because it interferes with the fair exercise of the stockholder franchise. The defendants have moved to dismiss under Court of Chancery Rules 23.1, 12(b)(6), and 23. Because the plaintiffs' claims are not derivative, the motion to dismiss under Rule 23.1 is denied. The motions to dismiss under Rules 12(b)(6) and 23 will be deferred until trial, which is scheduled to begin in two weeks.

## I.    BACKGROUND

The following facts are taken from Plaintiffs' Amended Verified Class Action Complaint Challenging Board Reduction Resolution (the "Amended Complaint") and the documents incorporated by reference therein. Am. Verified Class Action Compl. Challenging Board Reduction Resolution [hereinafter Compl.], Dkt. 24; *see*

1

*Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013) ("A judge may consider documents outside of the pleadings only when: . . . the document is integral to a plaintiff's claim and incorporated in the complaint . . . ." (citing *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612 (Del. 1996))).

**A.** **Plaintiffs Threaten A Proxy Contest, And The Board Amends Ionic's Bylaws To Reduce The Number Of Class I Director Seats Up For Election At Ionic's Upcoming Annual Meeting.**

Plaintiffs Veton Vejseli, Brett Perry, and Christopher Villinger ("Plaintiffs") are stockholders of Ionic, a Delaware corporation that was formed on January 5, 2024, as part of Celsius Network, LLC's Chapter 11 bankruptcy proceeding. Compl. ¶¶ 23–25, 33.

Ionic has a classified Board with directors in each of three classes serving three-year terms. *Id.* ¶ 35. In January 2024, the Board comprised eight directors, including three in Class I (with terms expiring at Ionic's first annual meeting), three in Class II (with terms expiring at Ionic's second annual meeting), and two in Class III (with terms expiring at Ionic's third annual meeting). *Id.* ¶¶ 36, 52–53.

Since its formation in January 2024, Ionic has undergone significant Board and management changes. Five of Ionic's eight initial directors have departed but only one vacancy has been filled, leaving two Class I vacancies and two Class II vacancies on the Board. *Id.* ¶¶ 36, 53. In addition, since January 2024, Ionic has

2

employed three Chief Executive Officers, three Chief Financial Officers, and two Chief Legal Officers. *Id.* ¶ 2.

In the spring of 2024, non-party Figure Markets, Inc. ("Figure Markets")—a blockchain-native, decentralized custody exchange for digital assets—made a proposal to the Board that Ionic should list its stock on Figure Markets' alternative trading system. *Id.* ¶¶ 40, 43. The Board did not accept Figure Markets' proposal. *See id.* Figure Markets attempted to purchase Ionic stock, but Ionic's transfer agent informed Figure Markets that it could not make the purchases due to a transfer restriction that required Board approval. *Id.* ¶ 41.

In the summer of 2024, Ionic stockholders, including Vejseli, took to social media to vent their frustration with the Board and Ionic's business, including Ionic's failure to publicly list its shares to provide stockholders liquidity after the Celsius bankruptcy. *Id.* ¶¶ 37, 39. In the following weeks, Vejseli partnered with Figure Markets to seek stockholder support to call a special meeting of stockholders to effect change at Ionic. *Id.* ¶¶ 40–44. Through outreach on social media, Vejseli and Figure Markets collected names and contact information from holders of approximately 25% of Ionic's outstanding stock via an electronic form that expressed the desire to remove three members of the Board. *Id.* ¶¶ 44–45.

In September 2024, Vejseli made a books and records demand under 8 *Del. C.* § 220 ("Section 220") seeking Ionic's stock list and other materials. *Id.* ¶¶ 5, 46.

3

In December 2024, Perry and Villinger, along with seven other Ionic stockholders, made a separate books and records demand under Section 220 seeking Ionic's stock list and related materials to run a proxy contest at Ionic's annual meeting. *Id.* ¶¶ 49–50, 56. Ionic refused to produce the stock list unless Plaintiffs agreed not to accept financial support from non-stockholders, including Figure Markets and non-party GXD Labs LLC ("GXD"), for a proxy contest. *Id.* ¶ 47. Plaintiffs initiated a summary proceeding in this Court to enforce their books and records demands, which culminated in a one-day trial after which the Court ordered production of the stock list, subject to certain conditions. *See Vejseli v. Ionic Digit., Inc.*, C.A. No. 2025-0138-BWD (Del. Ch. Mar. 13, 2025) (TRANSCRIPT).

By January 20, 2025, Ionic recognized Vejseli as a "putative Board candidate" and "aspiring fiduciary" who intended to run a proxy contest to elect multiple new directors at Ionic's upcoming annual meeting. Compl. ¶¶ 7, 56, 58.

On February 6, the Board adopted a resolution to amend Ionic's bylaws (the "Bylaws") to reduce the number of directors on the Board from six to five,[1] "with

---

[1] After Ionic terminated its contract with U.S. Data Management Group, LLC ("Hut 8"), the Board was reduced from eight to six directors. *See* Compl. ¶ 53 n.3 ("Pursuant to the Company's certificate of incorporation, upon termination [of the Hut 8 contract] no seats on the Board would be designated as 'Class B' seats, but the seats themselves would remain.").

the number of Class I directors set at 1" (the "Board Reduction Resolution").[2] *Id.*

¶ 83. The same day, Ionic issued a press release announcing that it would hold its first annual meeting (the "Annual Meeting") on March 17, but did not disclose that the Board had adopted the Board Reduction Resolution. *Id.* ¶¶ 62–63.

**B.  Plaintiffs Deliver A Nomination Notice Identifying Two Director Nominees In Connection With Ionic's Upcoming Annual Meeting, Then Learn Of The Board Reduction Resolution.**

On February 14, Plaintiffs submitted a nomination notice identifying two candidates for the two Class I seats that Plaintiffs believed were up for election (the "Nomination Notice").[3] *Id.* ¶ 69; *see* DOB, Ex. D [hereinafter Notice]. On February 17, Plaintiffs submitted completed questionnaires for their two nominees. Compl. ¶ 69.

The Bylaws include a provision requiring stockholders to provide the Board with advance notice of, and information about, director nominations. Section 2.4(iii)(c)(9) of the Bylaws (the "Advance Notice Bylaw") requires that:

---

[2] Section 3.2 of the Bylaws states that "the Board shall consist of no less than five members . . . each of whom shall be a natural person" (the "Board Size Requirement"). Compl. ¶ 89. Plaintiffs allege that, "[b]y purporting to reduce the number of seats up for election from two to one, the Board effectively prevented the stockholders from electing a fifth director capable of satisfying the Board Size Requirement." *Id.*

[3] Plaintiffs allege that Ionic's after-hours announcement of the Annual Meeting on February 14 "artificially compressed" the deadline to nominate directors under the Bylaws from ten days to seven, "because the [B]ylaws required physical delivery of the nomination notice at the Company's executive offices, and ten days ended on a Sunday, when those offices would be closed." Compl. ¶ 62.

To be in proper written form, the Noticing Stockholder's notice must also set forth: . . . (9) any agreements that would be required to be described or reported pursuant to Item 5 or Item 6 of Schedule 13D or filed as exhibits pursuant to Item 7 of Schedule 13D (regardless of whether the requirements to file a Schedule 13D are applicable to such stockholder or beneficial owner)[.]

DOB, Ex. C [hereinafter Bylaws] § 2.4(iii)(c)(9).

In an effort to comply with the Advance Notice Bylaw, the Nomination Notice summarized, but did not attach:

- a September 25, 2024 Amended and Restated Mutual Non-Disclosure and Common Interest Agreement between Vejseli, Figure Markets, and GXD (the "September MNDA");[4]

- a December 10, 2024 Amended and Restated Mutual Non-Disclosure and Common Interest Agreement between Plaintiffs, Figure Markets, and other Ionic stockholders (the "December MNDA");[5] and

- a February 14, 2025 Solicitation Agreement between Plaintiffs, Figure Markets, and GXD (the "Solicitation Agreement").[6]

Notice at 8, 17.

---

[4] DOB, Ex. G at Ex. B.

[5] DOB, Ex. G at Ex. C.

[6] DOB, Ex. G at Ex. A [hereinafter Solicitation Agt.].

On February 24, Ionic sent an email to stockholders directing them to a website with details about the Annual Meeting (the "Proxy Website"). Compl. ¶ 74. In a letter posted on the Proxy Website, Ionic disclosed that the only business at the Annual Meeting would be "[t]he election of a single Class I director to the Board to serve until the Company's 2028 Annual Meeting," and that one incumbent director, Elizabeth LaPuma, would be "standing for re-election to the single Class I seat on the Board that is up for election at the Annual Meeting." *Id.* ¶¶ 12, 74, 77. The next day, Plaintiffs discovered that Ionic had updated the governance page on its website to disclose the Board Reduction Resolution. *Id.* ¶ 83.

On February 28, the Board determined that the Nomination Notice was deficient, and on March 3, Ionic issued a press release announcing that the Nomination Notice was invalid because it failed to comply with the Advance Notice Bylaw. *Id.* ¶¶ 17–18. The March 3 press release stated that:

> [T]he Notice failed to attach a copy of the funding agreements between the Dissident Stockholders and the non-stockholders that financially support the Dissident Stockholders (including, among other things, through the payment of the Dissident Stockholders' attorney fees, costs, and expenses). The Notice also failed to disclose required information about the plans and proposals for Ionic by the Dissident Stockholders, their purported nominees, and the non-stockholder investors that are financially backing the Dissident Stockholders, including Mike Cagney, his company Figure Markets, and GXD Labs.[7]

_____

[7] *Ionic Digital Rejects Invalid Director Nominating Notice from Dissident Stockholders, Brett Perry, Veton Vejseli, and Christopher Villinger*, Ionic Digital (Mar. 3, 2025).

The same day, Plaintiffs initiated this action through the filing of a Verified Class Action Complaint Challenging Board Reduction Resolution (the "Initial Complaint"). Dkt. 1.

On March 5, Plaintiffs' counsel informed Defendants' counsel that Ionic's "belated deficiency notices were pretextual and baseless,"[8] but nonetheless provided a copy of the September MNDA, December MNDA, and Solicitation Agreement, as well as three additional, previously undisclosed agreements:

- an August 30, 2024 Group Agreement between Vejseli and Figure Markets (the "First Group Agreement");[9]

- an October 7, 2024 Amended & Restated Group Agreement between Vejseli, Figure Markets, and Nexxus Holdings Advisors LLC (the "Second Group Agreement");[10] and

- an October 21, 2024 Amended & Restated Group Agreement between Vejseli, Figure Markets, and GXD (the "Third Group Agreement").[11]

Plaintiffs did not provide a copy of any engagement letters with Olshan Frome Wolosky LLP ("Olshan") or other counsel ("Engagement Letters"), even though

---

[8] *See* Compl. ¶¶ 113–14; DOB, Ex. G.

[9] DOB, Ex. G at Ex. D.

[10] DOB, Ex. G at Ex. E.

[11] DOB, Ex. G at Ex. F.

Paragraph 13 of the Solicitation Agreement provided that Olshan "shall act as counsel for each of the Parties relating to the Purpose" defined in that agreement. Solicitation Agt. ¶ 13.

In other words, the Nomination Notice summarized, but did not attach, the September MNDA, December MNDA, and Solicitation Agreement, and did not disclose the First Group Agreement, Second Group Agreement, Third Group Agreement, or Engagement Letters. Defendants argue that the Nomination Notice failed to comply with the Advance Notice Bylaw because it did not disclose and provide a copy of each of those agreements. DOB at 32–42.

### C. Procedural History

As noted above, Plaintiffs initiated this action on March 3, 2025. Dkt. 1. Contemporaneous with the filing of the Initial Complaint, Plaintiffs moved for expedited proceedings and a preliminary injunction. *Id.* On March 6, the Court held a hearing at which it expedited the proceedings in advance of a hearing on Plaintiffs' motion for preliminary injunction, but soon after, the parties agreed instead to a two-day expedited trial, which is scheduled to begin on May 8.[12] Dkt. 13.

---

[12] During a March 7 status conference, the parties reported their agreement to delay the Annual Meeting until thirty days after the Court has issued a decision in this action, obviating the need for a preliminary injunction hearing. Tr. of 3-7-2025 Tele. Scheduling Conference 3:19–4:13, Dkt. 22.

On March 19, Plaintiffs filed the operative Amended Complaint, which asserts four counts: Count I alleges a claim challenging the Board Reduction Resolution as a breach of fiduciary duty; Count II alleges a claim challenging the Board Reduction Resolution under the Bylaws; Count III alleges a claim challenging the Board's rejection of the Nomination Notice as a breach of fiduciary duty; and Count IV alleges a disclosure claim. Compl. ¶¶ 133–59.

On March 27, the Court resolved a scheduling dispute by directing that:

> The parties will brief Defendant's motion to dismiss in advance of trial. After the motion is fully briefed, the Court will determine whether to resolve the motion to dismiss in advance of trial or in connection with its post-trial ruling. Discovery will not be bifurcated or stayed; delaying discovery is impracticable given the expedited schedule.

Dkts. 35–37. Defendants moved to dismiss the Amended Complaint on April 4 (the "Motion to Dismiss").[13] Dkt. 54. The Court heard oral argument on April 23.

---

[13] On April 4, Defendants filed their Opening Brief in Support of Motion to Dismiss Verified Class Action Complaint Challenging Board Reduction Resolution Pursuant to Court of Chancery Rules 12(b)(6), 23, and 23.1. Dkt. 55 [hereinafter DOB]. On April 17, Plaintiffs filed their Answering Brief in Opposition to Defendants' Motion to Dismiss. Dkt. 74 [hereinafter PAB]. On April 19, Defendants filed their Reply Brief in Further Support of Motion to Dismiss Verified Class Action Complaint Challenging Board Reduction Resolution Pursuant to Court of Chancery Rules 12(b)(6), 23, and 23.1. Dkt. 76 [hereinafter DRB].

## II. ANALYSIS

Defendants have moved to dismiss Counts I and II of the Amended Complaint under Court of Chancery Rule 23.1; Counts II, III, and IV under Court of Chancery Rule 12(b)(6); and all counts "as to any class" under Court of Chancery Rule 23.

### A. The Motion To Dismiss Under Rule 23.1 Is Denied Because Counts I And II Raise Direct, Not Derivative, Claims.

Defendants move to dismiss Counts I and II because those counts purportedly "assert derivative claims and Plaintiffs failed to comply with Court of Chancery Rule 23.1." DOB at 16.

Counts I and II challenge the validity of the Board Reduction Resolution. Count I alleges that the Board Reduction Resolution is the product of a breach of fiduciary duty because it is "not a proportional response to any reasonably perceived threat to corporate policy and effectiveness" and interferes with "the fair exercise of the stockholder franchise at the Annual Meeting." Compl. ¶¶ 134–36. Count II alleges that the Board Reduction Resolution violates the Bylaws, which require that "the Board shall consist of no less than five members." *Id.* ¶¶ 140, 143. Both counts seek to invalidate the Board Reduction Resolution so that stockholders can elect two directors instead of one at the upcoming Annual Meeting. *Id.* ¶ 143.

Defendants contend that Counts I and II are derivative "dilution" claims that "belong to Ionic," and Plaintiffs must therefore "satisfy the requirements for derivative standing under Court of Chancery Rule 23.1—including by pleading with

11

particularity that their failure to make a demand is excused, which Plaintiffs make no effort to do." DOB at 16–17. Plaintiffs respond that Counts I and II are not derivative, but direct, claims.

Although Plaintiffs label Counts I and II as direct, the Court must "look beyond the labels used to describe the claim, evaluating instead the nature of the wrong alleged." *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *7 (Del. Ch. July 26, 2018). To do so, the Court applies the test in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004). Under *Tooley*, the question of whether a claim is direct or derivative "turn[s] *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033.

Under *Tooley*, Counts I and II are direct claims. Plaintiffs contend that "Defendants implemented the Board Reduction Resolution on the eve of a proxy battle, with the intent and effect of directly impairing the stockholders' right to effect Board level change at the ballot box." PAB at 21 (emphasis removed). It is the stockholders, not the corporation, who suffer that alleged harm. Delaware law recognizes that "[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests." *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del. Ch. 1988). If stockholders are unhappy with company

12

performance, they have two key protections—they "may sell their stock . . . or they may vote to replace incumbent board members." *Id.* When fiduciaries interfere with a director election to make the latter more difficult, the stockholders lose a fundamental right. That is why Delaware courts consistently "regard 'a wrongful impairment by fiduciaries of the stockholders' voting power or freedom' as causing 'a personal injury to the stockholders, not the corporate entity,'" which itself has no right to vote on the election of directors. *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 802 (Del. Ch. 2022) (quoting *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 79 (Del. Ch. 1999)); *see also Carmody v. Toll Bros. Inc.*, 723 A.2d 1180, 1188–89 (Del. Ch. 1998) ("'[A]n entrenchment claim . . . [is] . . . individual . . . when the shareholder alleges that the entrenching activity directly impairs some right she possesses as a shareholder.'" (quoting *Avacus P'rs, L.P. v. Brian*, 1990 WL 161909, at *7 (Del. Ch. Oct. 24, 1990))); *Blasius Indus., Inc.*, 564 A.2d at 660 ("A board's decision to act to prevent the shareholders from . . . filling [board seats] . . . involves allocation, between *shareholders as a class* and the board, of effective power with respect to governance of the corporation." (emphasis added)).[14]

---

[14] Defendants point out that *Blasius*, *Gaylord*, and *Carmody* predate *Tooley*, DOB at 19–20, but the reasoning in those cases is entirely consistent with *Tooley*. *See, e.g., Gaylord*,

13

To argue otherwise, Defendants attempt to recast Counts I and II as alleging a "dilution" claim premised on a "diminution in stockholders' ability to affect board-level change." DOB at 17–18. For a claim challenging a transaction in which a corporation overissues shares for inadequate consideration (in other words, overpays), "[t]he alleged economic dilution in the value of the corporation's stock is the unavoidable result of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction." *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1266 (Del. 2021).[15] Defendants stretch to analogize that quintessential derivative harm to the injury alleged here, suggesting that reducing the number of director seats "dilutes" the stockholders' ability to effect change in the same way stockholders' voting rights are diluted in an overpayment scenario. But that is *not* the crux of Plaintiffs' claims, which center on the Board's allegedly inequitable interference with stockholders' ability to elect directors. *See CAMAC Fund L.P. v. Wagner*, C.A. No. 2023-0817-MTZ, at 17 (Del. Ch. Apr. 15, 2024) (TRANSCRIPT) (rejecting defendants' attempt to "recast[]" a *Blasius* claim as

---

747 A.2d at 79 (explaining that "a wrongful impairment by fiduciaries of the stockholders' voting power or freedom works a personal injury to the stockholders, not to the corporate entity").

[15] *See Brookfield Asset Mgmt., Inc.*, 261 A.3d at 1266 (explaining that a claim challenging a private placement of stock to a controller for allegedly inadequate consideration, resulting in dilution of the minority stockholders' voting power, is derivative).

a dilution claim where the complaint "plainly complain[ed] of a direct harm to [stockholders'] voting rights" and the plaintiff "could prevail without . . . showing any injury to the corporation").[16]

As for the benefit of any recovery, an order invalidating the Board Reduction Resolution and restoring the stockholders' right to elect two directors at the Annual Meeting would inure to the benefit of stockholders. The recovery would not run to the corporation, which, again, has no right to vote on the election of directors. Defendants say an order expanding the size of the Board would be "the equivalent of therapeutic governance changes" that benefit the corporation, but any such corporate benefit is secondary to the direct benefit to stockholders. DOB at 18.

Because Counts I and II allege direct claims, the Motion to Dismiss under Rule 23.1 is denied.

---

[16] Neither party cites a case in which this Court has characterized a claim involving an alleged impairment of voting rights in connection with a director election as derivative. *But see In re AMC Ent. Hldgs., Inc. S'holder Litig.*, 2023 WL 5165606, at *1, *10 (Del. Ch. Aug. 11, 2023) (certifying class and approving settlement of "direct" *Blasius* claim); *Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*, 2022 WL 453607 (Del. Ch. Feb. 14, 2022) (analyzing a claim that the board improperly rejected a nomination notice under enhanced scrutiny without undertaking a Rule 23.1 analysis); *Pell v. Kill*, 135 A.3d 764 (Del. Ch. 2016) (analyzing a *Blasius* claim in which plaintiffs challenged a board resolution reducing the number of director seats before an annual meeting without undertaking a Rule 23.1 analysis); *Openwave Sys. Inc. v. Harbinger Cap. P'rs Master Fund I, Ltd.*, 924 A.2d 228 (Del. Ch. 2007) (analyzing a claim that the board improperly reduced the size of the board in response to a stockholder's filing of a Schedule 13G to circumvent the director election process without undertaking a Rule 23.1 analysis).

## B. The Motions To Dismiss Under Rule 12(b)(6) And Rule 23 Are Deferred Until Trial.

Defendants move to dismiss Counts II, III, and IV under Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief may be granted. After careful consideration of the parties' briefing and oral argument—much of which relied on evidence outside the pleadings—the Court concludes it will be most efficient to address the parties' remaining arguments on a full record as part of its post-trial ruling. *See* Ct. Ch. R. 12(i) ("The Court may defer until trial ruling on any defense listed in Rule 12(b)—whether made in a pleading or by motion").

Defendants also move to dismiss Counts I, II, III, and IV "as to any class" under Court of Chancery Rule 23, asserting that these counts "cannot be maintained as class claims by Plaintiffs." DOB at 20–26. The Court previously advised the parties that:

> The Court will address class certification in connection with its post-trial ruling. *See, e.g.*, *In re Energy Transfer Equity, L.P. Unitholder Litig.*, 2018 WL 2254706 (Del Ch. May 17, 2018) (declining to address class certification before issuing an expedited post-trial ruling); *Wacht v. Continental Hosts, Ltd.*, 1994 WL 525222 (Del. Ch. Sept. 16, 1994) (deferring ruling on class certification until after trial). A later-stage ruling on class certification here will not be prejudicial to the parties, as class certification will not impact the manner in which this case is tried.

Dkts. 35–37. Notwithstanding that ruling, Defendants briefed class certification arguments in support of their Motion to Dismiss. DOB at 20–26. Plaintiffs declined to respond substantively, PAB at 26, and Defendants argued on reply that Plaintiffs

16

conceded their position on class certification. DRB at 9. To be clear, the Court did not expect the parties to brief class certification in connection with the Motion to Dismiss, and Plaintiffs have not waived any argument on that issue. The parties should address class certification in their pre-trial briefs.

## III.  CONCLUSION

For the reasons explained above, the Motion to Dismiss under Court of Chancery Rule 23.1 is DENIED. The Motions to Dismiss under Court of Chancery Rules 12(b)(6) and 23 are DEFERRED until trial.